## CANE et al. *v.* BATTLE.

Where there is no provision in the act creating a partnership for its continuance in case of the death of a partner, it will be dissolved thereby ; and the partnership name cannot be used afterwards, so as to bind the partners, but in virtue of some new authority. Such authority may be inferred from the subseqent conduct of the parties.

APPEAL from the District Court of Caddo, *Taylor*, J.

*Campbell*, for the plaintiffs, on the question of the ratification by plaintiffs, of the sale of *McNeill*, contended that, the ratification must be express. C. C. 2990. The difference between the provisions of this and the corresponding article of the Code Napoléon (art. 1998) will be remarked. In the Code Napoléon it is stated that the principal is not bound by the acts of the attorney, not in conformity with the power, except in so far as he has expressly, or tacitly ratified it. By our Code he is only bound in so far as he has expressly ratified it; the concluding words of the Code Napoléon, " *ou tacitement*," having been omitted in the latter, though the articles, in other respects, are identical. The ratification must further be in writing, where land is concerned (2 Greenleaf, Ev. 511).; and must necessarily result from the facts, after a deliberate examination of the acts of the agent. 13 La. 158. The act must clearly and unequivocally evince the intention to ratify (17 La. 293. Story on Agency, s. 242, 253); and have relation to the particular transaction. *Rivas* v. *Bernard*, 13 La. 175.

*Landrum*, for the defendant.

The judgment of the court was pronounced by

EUSTIS, C. J. This suit was instituted, in November, 1842, by *James H. Cane*, *Bushrod Jenkins*, *Frances E. Sprague* and *Henry M. Shreve*, who allege that they are the owners of four undivided sevenths of four certain lots in the town of Shreveport, and that the defendant is in possession of them and claims them as owner. They claim property in the lots according to their respective interests, and for judgment accordingly. The defendant claims title under a sale from the plaintiffs' agent, *Angus McNeill*, to *John O. Sewall*, the defendant having purchased the lots at the sale of the effects of the succession of the latter, made on the 6th of December, 1841, under an order of the court of Probates of the parish of Caddo. A judgment was rendered in favor of the plaintiffs, and the representatives of the owners of two other sevenths, who were considered as parties to the suit, against the defendant, for six sevenths of each of the lots; and the defendant has appealed.

There appears to have been no question as to the capacity of the several

parties plaintiff who claim to represent the original owners, and the argument has rested exclusively on the title of the defendant, resulting from the sale to *Sewall*, and its subsequent ratification.

On the 7th of February, 1837, *Bushrod Jenkins, Angus McNeill*, the commercial firm of *Bennett & Cane*, composed of *William S. Bennnett* and *James H. Cane*, all of the parish of Natchitoches, of which the parish of Caddo, in which Shreveport is situated, formed a part; *James B. Picket*, of South Carolina, *Thomas J. Williamson*, of Arkansas, *Henry M. Shreve*, then of Kentucky, and *Sturgis Sprague*, of Mississippi, having purchased six hundred and forty acres of land upon which the town of Shreveport stands, formed a partnership *in the above described town and the balance of the reserve:* the town having been laid out in lots, according to a lithographic map. The partnership was to be called the *Shreveport Company ;* a president and treasurer were to be elected annually; and the duty of the president was to sell lots, and give obligations for titles ; he was authorized to make titles, with full guarantee. The lots to be sold *alternately* in all squares where sales have not been made heretofore; the terms one-third cash, or what the president may deem equivalent thereto, the balance in one, two, and three years, with ten per cent interest, payable annually, secured by mortgage." This clause has been considered in argument as a sufficient authority to *Angus McNeill*, who was the president of the company, to make the sale to *Sewall*.

There are two acts of sale from *McNeill*, as president, to *Sewall;* the first was made by public act, before a notary in the parish of Natchitoches, on the 28th of July, 1837, and purports to convey the lots numbered 15 and 16, in block 24 ; the second was also made by authentic act before the judge of the parish of Caddo, which parish had recently been organized, was of lots 13 and 14, in block 24, and bears date the 17th day of August, 1838. The lots in the two sales, it will be perceived by their numbers, were contiguous. The terms of payment varied from those before recited, and no cash was required on either sale.

*Bennett*, one of the partners, died previously to the last sale, and *Sprague*, another, died on the 5th of October, 1838. Notwithstanding the death of *Bennett, McNeill*, as president of the Shreveport company, by public act in Shreveport, sold forty-three lots of ground belonging to the partnership in Shreveport to different persons, between the day of *Bennett's* death and that of the first sale to *Sewall*, to wit, between the 10th of August. 1837, and 17th of August, 1838. There does not appear to have been any provision in the articles of co-partnership concerning its continuance beyond the life of all its members, and the law is, on this subject, as stated by the counsel for the plaintiffs. After the death of *Bennett, McNeill* had no right to use the partnership name so as to bind the co-partners, unless derived from some new authority. The validity of his acts after the dissolution of the partnership, must depend entirely upon the relations and conduct of the partners concerned therein.

It is contended by the counsel for the plaintiffs that, the sale to *Sewall* is void, because *McNeill*, the president, did not follow the forms, restrictions, and qualifications prescribed in his written power to sell. It is true the requirements were not observed, and the lots were contiguous, instead of being alternate. The articles of partnership, in which the authority to sell was given, were under private signature, and appear to have been recorded in the office of the parish judge of Natchitoches, with the map of the town as laid out on the 24th February, 1837. It is obvious that this whole affair was one of those spe-

culations, which were so common at the time. The object of the partnership was, to sell their lots in such a manner as to give value to the land which remained. The expenditure of the proceeds of the sale, which were to be placed in the hands of the treasurer of the company, for improving roads, streets, *or any other purpose*, was vested in the discretion of a majority of the partners. Powers of attorney were to be given to the president by each of the partners, to enable him to execute titles. The renunciation of the rights of the wives of the partners who were married was to be given, and no dividends were to be received by such as did not furnish it. The Shreveport company was organized with the powers of the president to sell, in order to facilitate the sales of lots, and, by his agency, to give an impetus to the speculation. It is contended for the defendant, that after the dissolution of the partnership and the consequent revocation of the powers of the president, the surviving members still authorized *McNeill* to act as their agent; that they bought lots themselves from him, in his capacity as president of the company; and that he continued to dispose of lots to other persons, subsequently to the sale to *Sewall*, of the 17th of August, 1838.

In relation to the first sale, viz., that of lots 15 and 16, on the 28th of July, 1837, although *McNeill* deviated from the terms and conditions of his authority to sell, we think the silence of the parties interested for so long a period after the sale, their course in relation to the other sale, and the undisturbed possession of *Sewall* during his life, amount to a ratification which in law results from the voluntary execution of the sale. *McNeill* was the agent and partner of the several proprietors; he sold, and as no proof has been adduced to the contrary, we are bound to infer from the attending circumstances that, as his act was never, until the institution of this suit in 1842, disavowed, and the proceeds of the sale inured to their benefit in the partnership concern, that they considered the sale as binding on them. At all events, in law, they cannot be permitted, at this time, to disturb it in the hands of a purchaser whose good faith is not questioned. *Marsh* v. *Smith*, and cases cited, 5 Rob. 518.

But in relation to the last sale, there can be no question that *Sewall* acquired no title whatever under it, except that which *McNeill* himself had. The formal protest of a portion of the proprietors immediately after the sale was known to them, puts an end to all doubt on the subject. The partnership was dissolved. *McNeill* had no authority to sell for his partners. No act, on the part of the co-proprietors, has been shown, from which a ratification results. Indeed we can come to no other conclusion than that the sale of August, 1838, was a fraud throughout, as there was a suit pending at the time which had been instituted in June previous, for a partition of the property then remaining unsold, in which *McNeill* was a party plaintiff, and *John O. Sewall* was, at the time, secretary to the company.

The judgment of the District Court is, therefore, reversed, as to the lots 15 and 16 in square no. 24, and as to them judgment is rendered for the defendant; and in other respects it is affirmed; the appellees paying the costs of this appeal.

SLIDELL, J. The facts upon which this case depends are extremely complicated; and the difficulty of ascertaining their legal effect is much increased by the obscure and imperfect manner in which portions of them are presented by the evidence.

1. The result of my examination is, a concurrence in the decree with regard to the lots sold in 1837.

II. With regard to those sold in 1838,.my conclusion to concur has been formed with more difficulty. It is not easy, in the perusal of the evidence, (much of which consists of brief admissions by the respective litigants.) to exclude the impression that, if the minute-books and other records of the company had been produced, and the various proceedings and acts of the company and its members down to the institution of this suit had been exhibited fully and in detail, it would have presented such a case as would have precluded the plaintiffs from disturbing the third possessor. But, as the cause has been pending several years, and there is reason to believe that the defendant had the means of fuller evidence within his reach, and with reasonable diligence could have presented it, he must abide by the case as made. It does not show a state of facts from which the ratification of the second sale necessarily results. The burden of proof was upon the defendant. See *Bernard v. Rivas*, 13 La. 174.

I, therefore, concur in the entire decree.